UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MAINE SCHOOL ADMINISTRATIVE DISTRICT NO. 56, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 06-81-B-W |
| MS. W, on her own behalf and on behalf of her son, KS, | ) ) ) | |
| Defendants. | ) ) | |

## RECOMMENDED DECISION

Ms. W, the mother of KS, was the victor in a due process hearing conducted by a State of Maine hearing officer under the Individuals with Disabilities Education Act and related Maine statutes and regulation.  The hearing officer found that Maine School Administrative District 56 failed to develop an individualized education program to address KS's unique special education needs for the 2004-2005 and 2005-2006 school years, thereby denying him a free appropriate public education.  The hearing officer further found that a private placement initiated by KS's parents for the 2005-2006 school year was an appropriate placement and awarded the family partial tuition reimbursement despite finding that they had failed to provide the District with proper advance notice of the private placement.  The District filed suit in July 2006 seeking a reversal of the hearing officer's order and the matter is now before the Court on the District's motion for judgment on the administrative record.  (Docket No. 7.)  I recommend that the Court affirm the hearing officer's award.

## The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491,[1] is designed to ensure "a free appropriate public education" to children with disabilities.  20 U.S.C. § 1400(d).  To reach this goal, Congress provides federal funding to the states, provided that they implement specific policies and procedures set forth in the IDEA.  See id. § 1412(a). The general prerequisite to a state's receipt of federal funds is the provision of a "free appropriate public education" in the "least restrictive educational environment " to all disabled children residing within the state.  Id. §§ 1412(a)(1) & (5).  The "free appropriate public education, " or "FAPE," that Congress envisioned consists of an education "that emphasizes special education and related services designed to meet the[] unique needs" of each child, id. § 1400(d)(1), by affording "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability."  Id. § 1401(29).  See also id. § 1401(9).  By "least restrictive educational environment," Congress sought to ensure that children with disabilities will be educated alongside non-disabled students "[t]o the maximum extent appropriate."  Id. § 1412(a)(5)(A).

To qualify for special education and related services under the IDEA, a child must have a qualifying disability.  A "child with a disability" is defined as a child

> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . ., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, needs special education and related services.

Id. § 1401(3)(A).  Pursuant to the IDEA, the unique needs of each child are to be set forth in an individualized educational program (IEP), developed by a team of individuals including the

---

[1]       Certain portions of the IDEA were amended in 2004 by the Individuals with Disabilities Education Improvement Act of 2004 (IDEIA), 108 P.L. 446.  The amendments had an effective date of July 1, 2005.  See 20 U.S.C. § 1412 (hist. and stat. notes) (Supp. 2006).  I continue to refer to the Act by the unimproved acronym, IDEA.

child's parents, the child's regular and special education teachers, a qualified representative of the local educational agency, various consulting experts and, where appropriate, the child.  Id. § 1414(d).  In Maine, that team is known as the Pupil Evaluation Team (PET).  See Mr. I. v. Me. Sch. Admin. Dist. No. 55, 2007 WL 641988, 2007 U.S. App. LEXIS 5128, ___ F.3d ___, ___ (1st Cir. Mar. 5, 2007).  The IEP is a written statement that is developed, periodically reviewed (at least annually) and revised by the PET in accordance with specific procedures set forth in the IDEA. 20 U.S.C. § 1414(d)(3) & (4).  Although the PET tries to reach consensus, "the school district retains the 'ultimate responsibility to ensure that a student is appropriately evaluated' for IDEA eligibility."  Mr. I., 2007 WL 641988 at *2, 2007 U.S. App. LEXIS 5128 at *5, ___ F.3d at ___ (internal quotation marks omitted).  In the event that parents are dissatisfied with an agency's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child", 20 U.S.C. § 1415(b)(6), the IDEA entitles them to present their complaints in an "impartial due process hearing," id. § 1415(f).  In addition to providing parents the right to an administrative hearing, the IDEA also grants to any party "aggrieved by the findings and decision" of the hearing officer, the right to bring an IDEA "civil action" in either state court or the appropriate United States District Court.  Id. § 1415(i)(2).

## Standard of Review

The Court of Appeals for the First Circuit has described the "ultimate question" in an IDEA appeal as "whether a proposed IEP is adequate and appropriate for a particular child at a given point in time."  Burlington v. Dept. of Educ., 736 F.2d 773, 788 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985).  A school district is "not require[d] . . . to provide what is best for a special needs child."  L.T. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004).  It need only provide an IEP that is "reasonably calculated to enable the child to receive educational benefits,"

not excellence, "and the courts can require no more." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (White, J., dissenting); see also Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992-93 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991).

The procedural task Congress has assigned to the courts in IDEA actions is to "receive" the record of the administrative proceedings, consider additional evidence offered by a party, and grant "appropriate" relief based on a preponderance of the evidence. Id. § 1415(i)(2)(B). That task has been interpreted as requiring the courts to review the administrative proceedings using a unique, intermediate standard of review that involves independent consideration of the evidence and an evaluation of the hearing officer's decision that is more vigorous than clear-error review, but less vigorous than de novo. This standard tempers the authority to grant appropriate relief in recognition of the fact that judges generally lack specialization in education policy. Rowley, 458 U.S. at 206-208; Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993). Of course, the Court's review of the evidence is to be aided by the parties, particularly the complaining party, for "the burden rests with the complaining party to prove that the agency's decision was wrong." Roland M., 910 F.2d at 991 (citing Kerkam v. Mckenzie, 862 F.2d 884, 887 (D.C. Cir. 1988) ("[W]e think it clear that a party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong.")). "In the end, the judicial function at the trial-court level is 'one of involved oversight,' and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Lenn, 998 F.2d at 1087 (quoting Roland M., 910 F.2d at 989).

## Background

KS is presently an eighth grade student at Searsport Middle School. This case concerns the appropriateness of the IEP developed for him by the District's Stockton Springs Elementary

School (SSES) during the fifth grade (2003-2004) as modified by the Searsport District Middle

School (SDMS) during the sixth grade (2004-2005), as well as the appropriateness of the parents'

private placement of KS at the Come Spring School for specialized instruction in reading and

writing during his seventh grade (2005-2006) school year.

KS was first diagnosed with learning-related disabilities in 2000, during his first grade

school year (1999-2000). Most significantly, a clinical psychologist placed KS's symptoms in

the Attention-Deficit Hyperactivity Disorder (ADHD) category, flagging significant

inattentiveness, motor restlessness and impulsivity. (R. at 141.) KS moved with his mother to

Stockton Springs in the summer of 2000. In the third grade (2001-2002) his mother, Ms. W, and

his classroom teacher, Ms. Baldus, made a special education referral for KS due to concern for

KS's visual tracking and reading/writing skills. (R. at 127.) Jane Austin, the resource room

educator for SSES, ran a battery of tests in November 2001. (R. at 128-133.) Some of KS's

aptitudes were measured in the "low average" range, but average nonetheless. KS's relative

weaknesses were in reading, writing, short term memory, processing speed and auditory

processing. Behavioral issues flagged by the tests were more of a concern. KS had significantly

high ratings in the categories of unreflectiveness, irrelevant talk, intellectual dependence, failure

anxiety and blaming. (R. at 132.) A "psychoeducational reevaluation" was performed in late

November 2001 to address reports of diminished functioning in the areas of written expression,

processing speed and tracking difficulties in order to assist KS's PET with the task of

determining whether KS qualified for special education services. (R. at 148-54.) The test

administrator found elevated inattention, hyperactivity and social problems to be an area of

concern at school. (Id. at 150.) Intelligence testing reflected average cognitive ability with a

relative weakness in the area of "mental control," though that score, too, was still marginally within the average range. (Id. at 151-52.)

The PET met on December 4, 2001, to review the various evaluations and consider whether KS was eligible for services. (R. at 125.) It concluded that KS was not eligible for special education services as a student with a learning disability. It advised that the parents consider medication for KS's reported ADHD, something that they were previously opposed to. The parents expressed concern that KS was being teased for nervous "tics" he sometimes exhibited. The PET concluded that "Ms. Baldus will deal with this." (R. at 127.) The PET also advised occupational therapy (OT) screening to address KS's need for sensory input. (Id.) OT screening was promptly conducted in December 2001. The screener observed KS in the school setting and advised that KS be provided with an organizational schedule to help with orientation and counteract distractibility. She also advised the use of a head set to block out noise during work and "hand fidgets" of various textures and surfaces, presumably to supply sensory input and a diversion for his motor restlessness. (R. at 147.)

In March of 2002, SSES administered the TerraNova to its third grade class, a battery of standardized achievement tests that measure students' relative acquisition of the academic content and skills common to the curricula of schools nationwide. The test indicated that KS's reading and language skills were at a grade level of 2.3. (R. at 289.) KS had taken the TerraNova in second grade as well. In March of 2001 his reading and language skills were measured to be at grade levels 1.7 and 1.8, respectively. (R. at 293.) The TerraNova results suggest that KS was almost one (0.7) grade level behind in third grade, when he had only been slightly behind in second grade (0.2-0.3).

KS started taking medication for ADHD in April 2002.  (R. at 278.)  Ms. W obtained a neuropsychological exam in the fall of 2002, shortly after the start of KS's fourth grade year. Clinical neuropsychologist James Thomas, Ph.D., who conducted the exam, described KS's academic performance, as reported by Ms. W, as "mostly satisfactory," but for weakness in reading and writing.  (R. at 277.)  His description of prior evaluations noted that no learning disabilities had previously been diagnosed, only a relative weakness in reading.  (R. at 278.) Neuropsychological testing demonstrated that KS's auditory attention span was in the low average to mildly impaired range and that he seemed to have some language impairment:  he was reported to be moderately impaired in his ability to name objects and mildly impaired in the ability to rapidly name numbers.  (R. at 280.)  Attention and planning skills were also regarded as somewhat impaired.  (R. at 281.)  KS's reading and writing skills reflected developmental delays.  (Id.)  Reading and writing skills, generally, were measured as being at the middle of the second-grade level.  (Id.)  Phonological decoding skills were lowest, measured as lower first-grade level.  (Id.)    Conclusory findings were, among other things, that KS has a problem with "organization of verbal learning";  that his naming problem is a form of Expressive Language Disorder; that his handwriting problems are a form of Developmental Coordination Disorder. (R. at 283.)  KS's reading delays do not appear to have warranted a diagnosis of any particular disorder, though impairment was noted and it was opined that "he can be diagnosed with learning disabilities" in the areas of reading and writing aptitude.  (R. at 284.)  Personality testing also reflected low self-esteem and that KS met the criteria for Oppositional Defiant Disorder. (Id.)    In addition to these evaluations, the ADHD diagnosis was maintained and KS was recommended for follow-up to screen for Bipolar Disorder.  (R. at 284-85.)  Dr. Thomas recommended that KS "be considered for extra instructional help in reading, writing, and

phonics"; that he receive assistance structuring and organizing his work; and that he receive additional OT services to address "visuospatial" coordination and improve his handwriting. (R. at 285.)

Ms. W supplied the District with a copy of Dr. Thomas's report in late 2002. In December 2002, SSES administered the Maine Educational Assessment (MEA). The test indicated that KS did not meet performance expectations in writing and only partially met expectations in reading. (R. at 293.)

The PET reconvened on March 7, 2003, to reconsider KS's eligibility for services under the IDEA in light of Dr. Thomas's evaluation. (R. at 269.) Behavioral issues were largely downplayed and organizational deficits noted. Among other things, it was observed that KS has to be taken step by step through writing tasks and was not completing his in-school work. (Id.) The PET agreed that KS was eligible for services as a student with "other health impairment (ADHD)" (Id.) The PET prescribed the following services: special education services for 60 minutes, four times per week, in the school's resource room; some curriculum modification in his regular class; weekly guidance counseling to address social skills and peer relations; and referral to Rachel Stephenson LCSW, a school-based clinician employed by Sweetser, a behavioral health care organization, to address any behavioral issues. In addition, the PET called for speech and language testing and further OT screening. (R. at 267.) It appears that the resource room services targeted decoding skills and the use of designated reading cueing systems. (R. at 266.) Classroom/curriculum modifications included seating KS in the classroom for optimum attention, vision and hearing; assisting KS with organizational matters; and providing an assignment book for both teacher and parents to sign. (R. at 264-65.) OT screening and speech and language testing did not result in the addition of any further services, although OT screening

did reiterate the concern over organizational problems.  (R. at 256-260.)  The speech and language testing appears to have demonstrated solidly average performance in vocabulary retrieval and in receptive and expressive language skills.  (R. at 257.)

On the behavioral front, Ms. Stephenson testified that the referral she received from the school identified KS as needing services due to behavioral issues arising primarily in the home environment.  (R. at 503, 505.)  However, she identified the major stressors impacting KS's behavior as what his peers and teachers think of him at school and expectations related to his schoolwork.  (R. at 503, 505.)

### The fifth grade year

By the end of KS's fourth grade year (2002-2003), resource room educator Jane Austin noted that KS was able to complete fourth-grade reading skills and had made "wonderful gains." (R. at 266.)  Shortly after the commencement of the fifth grade year, in October 2003, the PET met for its annual review of KS's IEP.  Given his reading performance at grade level, the PET took away KS's resource room reading services and provided him with 15 minutes of consultation with Ms. Austin limited to the matter of task initiation and completion.  (R. at 252.) It also provided for "curriculum modifications" consisting of seating near the teacher for attention, a task orientation plan and assistance with task initiation.  (Id.)

SSES administered the TerraNova to KS's class in March of 2004.  The test results indicated, among other things, a reading score at grade level 4.4; a reading composite score at grade 5.4; and a language score at grade 3.0.[2]  The language tests were keyed to writing skills. (R. at 241.)  KS's weakest language results were in the area of sentence structure and writing strategies.  (Id.)

---

[2]        The language "composite" grade level was 4.0.

The PET convened for an annual review on May 11, 2004.  The PET reviewed the

TerraNova results, among other evaluations and assessments.  (R. at 236.)  The minutes indicate

that KS was "at grade level in all areas," with spelling being the weakest area, and they note KS's

gains in reading with his prior services.  KS's language scores from the TerraNova were not

noted and the PET essentially found KS as having needs limited to behavioral matters, with task

completion among them.  The IEP went essentially unchanged from the October 2003 IEP,

except it was noted that Ms. W (then Ms. S) would receive more frequent communication to be

provided via KS's assignment book.  (Id.)  The minutes of the meeting also clarify some of the

"behavioral" services being provided under KS's IEP with the following remark:

> [KS] has a behavior goal with resource intervention.  The plan calls for task
> completion, follow directions, stay in assigned area, be safe with others,
> appropriate language.  He is maintaining 95% compliance.  There are occasional
> days that don't go as well due to his emotional status.  On these days he is more
> chatty and impulsive.

(Id.)

*The sixth grade year*

KS transitioned to the Searsport District Middle School (SDMS) for sixth grade (2004-

2005).  (R. at 234.)  SDMS assigned KS to Ms. Anthonis for homeroom, whom Ms. W contacted

on a weekly basis.  By the end of the first quarter of the school year KS earned a place on

academic probation because of a number of zero grades related to his failure to turn in certain

homework assignments.  It appears that his graded work was satisfactory, but he was not earning

any credit for certain homework assignments that had not yet been turned in.  (R. at 519.)  Ms. W

requested a PET meeting in October 2004.  Instead, a parent/teacher conference occurred two

days later that was attended by what appears to be all of the PET members, as well as the SDMS

principal.  Ms. W asserted frustration that she had not been told of the missing homework, but

the staff indicated that the incomplete assignments were being noted in the assignment book that was supposed to serve as a means of communication between the teachers and Ms. W.  It also appears that Ms. Hoffman neglected to provide the specified resource room services (which included task completion services) for roughly the first month of the school year.  (R. at 472.)  It was agreed at the parent teacher conference that KS would go to the resource room each study hall to be sure he was organized and had his work completed.  Also, teachers would staple any missing assignments into the assignment book on a weekly or bi-weekly basis.  Ms. W was to look at the assignment book daily.  It was agreed that Ms. W could notate on KS's homework that he had worked on it for two hours and permit him to stop at that time.  (R. at 86-89, 214-218.)  Ms. Hoffman, the resource room counselor at SDMS, indicated that she contacted KS's teachers and that they had not reported any behavioral problems with KS.  Ms. Hoffman agreed that she would henceforth consistently fill out KS's behavior chart herself and assist KS with organization in the resource room at the end of the day  (R. at 217 ¶ 13.)  To overcome what she perceived as KS's embarrassment at having her come into the classroom to check his behavior chart during the day, Ms. Hoffman arranged for KS to be moved from the front of the class to a seat near the door.[3]  (Due Process Findings ¶ 47.)  Ms. Hoffman testified at the due process hearing that KS never had any behavioral issue during the majority of his sixth-grade year; that the only issue was completing assignments.  (R. at 472.)  She also testified that KS was "just like everyone else" in regard to incomplete assignments because the expectations had increased from fifth to sixth grade.[4]  (R. at 472, 475.)  Once his missing homework was addressed KS earned the

---

[3]    KS did not remain in this location throughout the year.  There does not appear to have been any testimony that the placement was detrimental in any way.  (R. at 526-27.)

[4]    Ms. Hoffman testified that KS's behavior issues "were that of a very, very normal sixth grade student in a school setting."  (R. at 475.)  The hearing officer took considerable exception to these statements concerning KS's "behavior."  (Due Process Findings at 24-25.)  In her defense, it was Ms. Hoffman who steered KS's IEP more directly toward direct organizational support, which is one of the issues the hearing officer felt was overlooked by the PET.

following grades for the first quarter of sixth grade:  English 82; Social Studies 87; Science 96; Math 86; Reading 86.  His conduct was reported by his teachers as "always appropriate."  (R. at 79.)

On November 4, 2004, Ms. Hoffman contacted Ms. Goguen, the special education director, to say that she wanted to change the objective of KS's IEP from behavior to organization and the PET convened on November 18, 2004.  (R. at 209, 473.)  This change was implemented in a way that called for his homeroom teacher, Ms. Anthonis, to oversee KS's assignment book every morning and afternoon to ensure that KS was getting assignments done and bringing home what he needed to do for homework.  (R. at 209, 527.)  As a consequence, Ms. Hoffman's involvement and KS's use of the resource room dropped to a monthly, 20-minute consultation from the prior, 15-minute daily check-in.  (R. at 209.)  It became Ms. Anthonis's responsibility to check KS's work, to make sure he had his assignments and took them home, to help KS keep his desk organized and to check his assignment notebook every morning to see whether he had completed his work.  If not, KS would do the work during the school day, sometimes with the assistance of the teacher who assigned the work.  (R. at 527.)

The PET noted that KS's parents opined that KS's involvement in school soccer may have contributed to his academic probation in October 2004.  (R. at 209.)  KS was having a difficult time with his homework assignments and was acting out at home by throwing tantrums.  (R. at 168-69.)  The PET agreed that KS should not do homework assignments at home for more than two hours per day and that, if more time was needed, KS could complete assignments at school and would be given an extra week to do them in.  (R. at 209, 527.)  Second-quarter grades were quite good:  English 80; Social Studies 84; Science 94; Math 82; Reading 80.  Third-quarter

grades slipped a little:  English 83; Social Studies 84; Science 86; Math 81; Reading 76.  (R. at 182.)

The new responsibilities Ms. Anthonis had for overseeing KS's assignment book were a source of some consternation for her.  The book was being used by Ms. W as a means of communication with Ms. Anthonis, and on one occasion, later in the year when KS was being particularly resistant to homework, Ms. Anthonis slammed the book down on the desk and made a remark about the "damned notes from your mother."  (R. at 521-22.)  According to Ms. Anthonis, her comment was along the lines of, "what are you trying to do to your mother and [me]," to which KS laughed in response.  (Id.)  The hearing officer found that Ms. Anthonis and Ms. W were both becoming increasingly frustrated with KS's reluctance to do his homework. (Due Process Findings ¶ 58.)  According to Ms. Anthonis, she gave the students her home phone number in case they failed to understand a homework assignment, so KS could have called her if he had a problem at home with a homework assignment.  According to her, there were times when KS would just say that he "didn't want to do it."  (R. at 520, 521.)  She also indicated that Ms. W reported KS's resistance to doing homework.  (Id.)  Because of these difficulties, KS was staying after school on occasion to finish up work that he failed to do at home or during the school day.  (R. at 521, 529.)  Fourth-quarter grades dropped significantly:  English 65; Social Studies 70; Science 79; Math 71; Reading 65.  (R. at 182, 523.)  KS was beginning to have behavioral problems toward year's end, as well.  In addition to being disciplined in March 2005 for "stealing" cookies from the lunchroom, in May and June KS called another student a "fat cow" two days in a row and threatened to "smash" another student's head.  (R. at 183-84, 199.) Sometime between the March and May incidents Ms. W indicated to the principal that she was considering a placement at Come Spring School, a private special education program in Union,

Maine.  (Due Process Findings ¶ 62.)  Ms. Anthonis reported that she had to modify KS's homework assignments in order to get him to perform any work in this timeframe.  (R. at 526, 528.)  She also testified during the due process hearing that KS's resistance to homework assignments was related to his difficulty with reading and writing tasks.  (R. at 520.)  All of KS's teachers noted that his work had dropped off in the final quarter.  (R. at 76.)  Still, KS achieved passing grades and was advanced to the seventh grade.  Ms. W enrolled KS in the Come Spring School that summer and he began attending the private program in September.  The District did not convene another PET meeting to review KS's IEP for the 2005-2006 school year.

## Discussion

The District challenges the hearing officer's findings that the District committed a "serious violation" of the procedural component of the IDEA in regard to developing KS's IEP and failed to develop an appropriate IEP for KS between March 2004 and June 2005, thereby denying him a FAPE.  In addition, the District challenges the hearing officer's decision to issue an award of tuition reimbursement to the parents, arguing that the Come Spring School was not an appropriate private placement and that the parents failed to timely notify the District of the private placement to enable it to address the parents' stated concerns through the IEP.  I find that the District's objection about procedural violations are largely warranted, in that it would be a stretch to conclude that the District deprived KS of a FAPE based exclusively on procedural shortcomings, but that the record is sufficient to justify the hearing officer's finding that the IEPs in question were deficient as well as her award of partial tuition reimbursement.

A.      *The record does not support a finding that the District deprived KS of a FAPE based exclusively on procedural shortcomings.*

The hearing officer found that the District failed to document all aspects of the IEP process conducted by the PET, including by failing to provide Ms. W with copies of various

"graded IEPs" and evaluation reports.  As for the evaluation reports, the hearing officer

recognized that these concerns arose remotely, beyond the statute of limitation, and are therefore

not determinative of the dispute.  (Due Process Findings at 18 n.1.)  As for documentation, it

does not appear that the hearing officer found these concerns to be serious enough to justify any

remedial measures.  I decline to address these peripheral matters.  The hearing officer found it

"more serious" that the District, in her view, failed to implement its IEP for well over a month at

the beginning of KS's sixth-grade year.  (Due Process Findings at 19.)  It is undisputed that Ms.

Hoffman did not engage in her component of the IEP with respect to KS's resource room

services for an appreciable period at the beginning of the school year.  According to Ms.

Hoffman, this was acceptable because, in her view, it is necessary to let a student like KS

"adjust" to a new school setting before beginning with special education services.  (R. at 472.)

> Pursuant to the IDEA:
>
> In matters alleging a procedural violation, a hearing officer may find that a child
> did not receive a free appropriate public education only if the procedural
> inadequacies--
>   (I) impeded the child's right to a free appropriate public education;
>   (II) significantly impeded the parents' opportunity to participate in the
> decisionmaking process regarding the provision of a free appropriate public
> education to the parents' child; or
>   (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii).  Ms. Hoffman's casual approach to the IEP in this instance was

inappropriate.  As found by the hearing officer, it was not for Ms. Hoffman to suspend the IEP of

her own accord.  Rather, it was her duty to supply the services she was called to perform under

the IEP.   Ms. Hoffman may well have "impeded" KS's right to a free appropriate education by

delaying the implementation of her duties under the IEP, because KS was briefly disqualified

from participating in the school's soccer program on account of his missing homework.  For

example, it may be the case that KS's brief academic probation could have been avoided had Ms.

Hoffman played an active role within this timeframe. KS's probation arose exclusively due to his failure to complete some homework assignments and it is clear that the behavioral component of his IEP was addressed, in part, to task initiation and completion. Nevertheless, the notion that this procedural violation alone deprived KS of a FAPE is, in my view, rather strained on this record. The academic probation appears to have lasted only one week and it appears the missing assignments were addressed in rather short order. It also appears that Ms. Hoffman got herself on task on account of this setback in KS's performance. Standing alone, I cannot find that the violation in question would reasonably warrant the imposition of equitable remedies such as tuition reimbursement or a finding that the District had denied KS a free appropriate public education so as to justify a private placement at the Come Spring School. To be sure, Ms. Hoffman's delay in providing services was appropriately faulted by the hearing officer, but this shortcoming in the District's performance simply did not independently lead to a denial of educational benefit or an appropriate public education.[5]

The final procedural fault attributed to the District lies in the hearing officer's finding that the PET failed to schedule a PET meeting to create an IEP for the 2005-2006 school year. (Due Process Findings at 19-21.) In particular, the hearing officer found that, because the November 18, 2004, PET meeting was not designated as an "annual review," the District was not entitled to wait until November 2005 before returning to KS's IEP. However, as she noted, the IEP was designated as being effective through August 31, 2005, by which time Ms. W had already enrolled KS at the Come Spring School. Ms. W's decision to remove KS from the District's public program without seeking a new IEP or notifying the District of her decision means that the District should not be subjected to equitable remedies for failing to review KS's IEP prior to

---

[5]       In fairness to the hearing officer, I do not believe that she would have imposed a tuition reimbursement award against the District on the basis of this circumstance alone, although she was clearly upset by portions of Ms. Hoffman's testimony in which she referred to KS as being just like any other child.

the start of his seventh-grade school year.  Most importantly, the fact that Ms. W unilaterally placed KS in the Come Spring School for seventh grade means that the District's failure to conduct an annual review of KS's IEP prior to his seventh-grade year cannot be the cause of a denial of educational benefit or a FAPE, even if the Court assumes that the failure to review KS's IEP did not square with the procedural expectations of the IDEA.  See Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 811-12 & n.23 (5th Cir. 2003) ("The other circuits that have addressed this question head on have consistently held that procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity . . . [and] [w]e do so today.") (collecting opinions from the Courts of Appeals for the Fourth, Sixth, Ninth and Tenth Circuits); Gray v. O'Rourke, 48 Fed. Appx. 899, 901-902 & n.6 (4th Cir. 2002) (unpublished opinion) (affirming ALJ's decision that parent's unilateral placement of child at private school relieved school district of responsibility to review child's IEP).  See also Amann v. Stow Sch. Sys., 982 F.2d 644, 651 & n.4 (1st Cir. 1992) ("Because the [appellants] did not complain formally about the IEP, or invoke their right to a [due process] hearing concerning its adequacy, there was no administrative or judicial review pending [during the period of private school enrollment] and hence no obligation to review and revise.").

In summary, under the circumstances of this case, the question of whether the District denied KS a FAPE is a question to be judged in light of the IEP that the District provided during his enrollment in the District's public school program, not in terms of its failure to review the IEP after his parents made a unilateral private school placement.  When the record is so limited, the only procedural violation that is of any apparent significance is Ms. Hoffman's brief failure to implement the IEP immediately upon the commencement of KS's sixth-grade school year.  That

violation,[6] standing alone, cannot reasonably be regarded as having denied KS the educational benefit that is to be expected of a FAPE, such as would justify an award of tuition reimbursement.

B.    *The hearing officer's finding that the District's IEP was inadequate in 2004 and 2005 is adequately supported by the record.*

The hearing officer found that the District failed to develop an appropriate IEP for KS between March of his fifth-grade year and the end of his sixth-grade year because the District failed to consider and failed to develop an IEP tailored to KS's unique needs.  (Due Process Findings at 21-26.)  Specifically, the hearing officer opined that the IEP statement of the student's needs was "wholly inadequate" because it failed to address his delays in reading, language and written expression, self-esteem issues, self-advocacy issues, motor tics and, broadly, "mental health" issues.  (Id. at 22.)  Next, the hearing officer faulted the IEP statement of objectives because of its identification of behavioral issues unrelated to completing work assignments.  (Id. at 22-23.)  In particular, she concluded that the IEP was deficient because in November 2004 it was revised in a manner that removed task completion from the list of goals and objectives.  (Id. at 23.)  In addition, she concluded that the IEP failed to provide sufficient detail about KS's needs in relation to his disability, so that a new teacher would not readily be able to understand KS's needs or his parents' concerns by reference to the IEP.  (Id. at 23.)  Another criticism voiced by the hearing officer was that the PET never considered providing KS with assistive technology such as a word processor, even though the PET was aware of his handwriting problems.  (Id. at 23.)  In addition, the hearing officer faulted the PET for not considering whether KS needed counseling services for any emotional needs.  (Id. at 24.)  The

---

[6]       This matter was treated by the hearing officer and is being treated by the parties as a procedural matter. Non-implementation of an IEP strikes me as more of a substantive concern, but I have addressed it in accordance with the parties' approach.

hearing officer believed that the IEP should have contained a self-esteem or self-advocacy goal because the record was "replete with references to the student's motor tics" and he had reported being teased at school.  (Id. at 24.)  As evidence of the lack of a FAPE being afforded to KS, the hearing officer focused on his grades for the fourth quarter of his sixth-grade year.  She expressed concern over the social and emotional costs KS may have experienced due to these grades.  (Id. at 25.)  As for his results in standardized testing, the hearing officer found that KS made "virtually no gain in reading" (id. at 26), because he was 1.3 grade levels behind in third grade and 1.2 behind in fifth.  Of even more concern, she concluded that KS was 2.6 grade levels behind in "language" in fifth grade whereas he had been only 1.3 behind in the third grade.  (Id.)  She concluded that "[w]ith the exception of some decoding work that was done with the student in fourth grade, the student's disabilities in language, reading, writing, social/emotional issues, and motor tics were not adequately addressed in the student's IEP document."  (Id.)

The District objects to these findings on the grounds that "each of KS's IEPs was reasonably calculated at the time it was drafted to provide him with educational benefit" and that KS in fact made "substantial gains . . . academically and behaviorally."  (Pl.'s Mem. at 25.)  The District asserts that KS's motor tics were never pronounced and that any emotional issues appeared to be tethered to the home environment, not to school-related issues.  (Id. at 26.)  It argues that the PET did consider those issues, but found them not to require special services.  (Id. at 26-27.)

Based on my independent review of the record, I am somewhat surprised that the hearing officer found so much fault with the District.  It should be noted that KS made significant gains in the area of reading thanks to decoding services he received in the SSES resource room in the spring of fourth grade.  Additionally, I am struck by the hearing officer's strong opinion that

emotional issues and motor tics were not adequately addressed.  In particular, although there are frequent references to "tics" there are no references I have been made aware of that suggest the tics presented a significant problem or that other self-esteem issues were significant enough to require focused, emotional counseling services as of the later half of the fourth grade or beyond in order for KS to achieve educational benefit at SDMS.  Moreover, with respect to self-esteem and self-advocacy, the PET did address these issues in March 2003 and called for weekly guidance counseling to address social skills and peer relations.  (R. at 267.)  There is nothing in the record to indicate that a more drastic intervention was called for.

Despite the foregoing concerns over some of the hearing officer's findings, I cannot say that the hearing officer's critique of the academic shortcomings in the IEPs lacks support in the record.  Although the District provided services to address KS's reading problems starting in March 2003 (thanks to the neuropsychological exam performed by Dr. Thomas), it did essentially ignore KS's more pronounced deficits in writing skills in 2003, 2004 and 2005.  Moreover, the PET seems to have had an almost single-minded focus on "behavior" until November 2004, including a focus on a number of behavioral skills that did not seem to have any connection with KS's actual needs.  My impression is that this behavioral focus was likely an outgrowth of a stereotypical approach to the ADHD diagnosis, without an adequate assessment of KS's unique needs.  This broad-brush approach was particularly evident in regard to KS's transition to middle school, although the omission of writing-related services was a notable drawback to his elementary programming as well.  Ultimately, it is my conclusion that the hearing officer's finding that the District's IEP was inadequate in 2004 and 2005 is not really susceptible to reversal by this Court.  Although the District deserves some credit for providing the decoding services that so improved KS's reading performance, it essentially ignored his

writing-related "language" issues.  The failure to provide any services to address KS's disabilities in these skills was reasonably regarded by the hearing officer as sufficient to deny KS a FAPE during both fifth and sixth grades.  The obvious omission of any writing-related language services was fairly regarded as unacceptable by the hearing officer because the PET never discussed or acknowledged the issue despite the neuropsychological exam that flagged KS's writing skills as even more deficient than his reading skills and despite KS's subsequent TerraNova test results, which plainly indicated that he had made only a 0.7 level advancement in the language test area despite two years of instruction, as compared with far more considerable advancement in the reading test area in which he had received special services.  This TerraNova test result indicated that although KS was almost at his grade level in "language" in third grade, he was two full grade levels behind by fifth grade.  This pronounced difficulty in writing tasks was or should have been apparent to KS's teachers and to the PET and should have been addressed in the IEP.  Ms. Anthonis certainly believed that KS's aversion to his homework assignments and his other task completion problems were related to difficulties associated in some fashion with his ADHD diagnosis (R. at 520), though it appears from the record, specifically the report issued by Dr. Thomas, that the difficulties were related to reading and writing disabilities that were not necessarily tethered to the ADHD diagnosis.  Under these circumstances, it was fair for the hearing officer to conclude that the District failed to provide KS with an adequate IEP in fifth and sixth grade.

C.     *The hearing officer's conclusion that the Come Spring School was an appropriate interim placement for KS is not legally erroneous.*

Pursuant to Section 1412 of the IDEA, a hearing officer may require an educational agency to reimburse a family for the cost of a private school placement if the hearing officer concludes that the agency failed to timely make available to the child a FAPE.  20 U.S.C. §

1412(a)(10)(C)(ii).  In addition to this statutory requirement, the courts also require proof that the private placement for which reimbursement is sought was itself "proper under the Act."  Sch. Comm. Of Burlington v. Dep't of Ed. of Mass., 471 U.S. 359, 369 (1985).  This does not mean that the private school must meet all state educational standards or be otherwise "approved" by the state.  Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 13-15 (1993).  It means only that the program must be reasonably calculated to provide educational benefit to the student by, among other things, addressing the special education needs omitted from the student's IEP.  Mr. I, 2007 WL 641988 at *19, 2007 U.S. App. LEXIS 5128, *63-*64 & n.22, ___ F.3d. at ___ & n.22  (1st Cir. Mar. 5, 2007).

The hearing officer found that Ms. W made an appropriate private school placement for KS when she enrolled him in the Come Spring School.  The Come Spring School is a small private school designed to assist students with learning disabilities who need remediation of certain academic skills.  According to a school-supplied flier, the Come Spring School provides individualized, one-on-one and small group instruction designed to strengthen students' performance in problem skill areas to help them succeed upon return to their original academic settings.  The school's enrollment is limited and only six students were enrolled when KS attended the program.  (R. at 157-58.)  Deborah Miller, an educator with the Come Spring School, testified concerning the school's programming as it related to KS.  Ms. Miller personally instructed KS in "language arts" and she eventually took over his math instruction as well.  (R. at 511.)  It is apparent from her testimony that she focused on assisting KS in the area of writing, primarily in the area of transferring his thoughts and ideas to paper.  (Id.)  She also observed that his penmanship was roughly at a second- or third-grade level, which she worked to remediate.  (Id.)  Another problem area for KS concerned his ability to dissect mathematical word problems.

22

(Id.)  This was another area in need of remediation that Ms. Miller provided personalized instruction in because of his inability to write out his answers to such problems.  (Id.)  It also appears from Ms. Miller's testimony that KS's success with reading/decoding services in the fourth grade did not resolve KS's reading disability (R. at 512), although his PET had acted as though the services had effectively cured KS's reading disability because they had served to bring his performance level up to a fourth-grade level (R. at 252).

The hearing officer's discussion of the appropriateness of the Come Spring School as a private placement for KS focused heavily on countering the District's argument that it could not be appropriate due to its very low enrollment limited to children with learning disabilities.  In the hearing officer's view, this characteristic did not make the placement inappropriate because it was outweighed by the focused instruction KS received, which she regarded as needed, and because it was envisioned as only a temporary placement to prepare KS for a successful return to the mainstream environment.  The District cites Rafferty v. Cranston Public School Committee, 315 F.3d 21 (1st Cir. 2002), to support a proposition that the hearing officer committed a legal error in finding that the Come Spring School was an appropriate private placement.  In the District's view, a finding of appropriateness is flatly ruled out in this case because of the small size of the Come Spring School's student body.  The District's argument overextends the holding of Rafferty.  In Rafferty, the Court of Appeals for the First Circuit affirmed a decision that a private placement was not appropriate because the student spent her entire time in the program alone with a clinician studying reading to the exclusion of all other topics.  Id. at 26-27.  The Court observed that mainstreaming cannot be ignored in a private placement.  Id. at 26 (quoting Rome Sch. Comm. V. Mrs. B., 247 F.3d 29, 33 (1st Cir. 2001)).  On its facts, Rafferty stands for the limited proposition that a private school placement is inappropriate for purposes of receiving

tuition reimbursement if it is designed to provide only individual instruction in a solitary subject area and the student is not otherwise participating in any mainstream program.  In this case the Come Spring School afforded instruction to KS in at least three core subject areas (reading, writing and mathematics) within a small community of learners.  Ms. Miller also testified that the school seeks to stay connected with the Maine Learning Results program and, among other things, administers the Maine Educational Assessments to its students.  (R. at 513, 516.)  There is no indication in the record that this curriculum would in any way compromise KS's ability to be reintegrated into the District's eighth grade program.  Although it is true that the Come Spring School does not afford the kind of mainstream program that the District offers, it did provide instruction in three core mainstream subject areas and, more importantly, focused its instruction to address learning disabilities that the District had either long ignored (writing) or else come to regard—likely erroneously—as somehow cured (reading).  In addition, the program did afford a social context that not only included other students, but also facilitated some instruction targeted at KS's social skills and esteem issues.  (R. at 511-13.)  It would be an unwarranted extension of Rafferty to conclude that the program given to KS at the Come Spring School cannot be considered an appropriate private placement as a matter of law due simply to its limited enrollment.  In conclusion, there is nothing in the District's presentation on this subject that indicates to me that the hearing officer should be reversed in her finding that Ms. W made an appropriate private school placement for KS.

D.      *Partial tuition reimbursement is not precluded by failure to provide notice.*

Section 1412 of the IDEA places some limitation on the parents' ability to obtain tuition reimbursement from the public educational agency.  The IDEA provides that "[t]he cost of reimbursement . . . may be reduced or denied" if the parents fail to provide adequate notice to the

agency of their rejection of the agency's IEP and their intention to enroll the student in a private school at public expense. 20 U.S.C. § 1412(a)(10)(C)(iii)(I). There is no real controversy over the hearing officer's factual finding that Ms. W failed to provide the District with sufficient notice. The controversy exists in the hearing officer's decision to reduce rather than deny an award of tuition reimbursement. According to the District, this aspect of the hearing officer's order should be reversed because the published cases predominantly reflect that courts have affirmed decisions to deny reimbursement when parents fail to comply with the statutory notice provision. (Pl.'s Mot. at 34-35.) The problem with this challenge, of course, is that the IDEA does not mandate that tuition reimbursement be denied. The governing language does not even mandate that tuition reimbursement be reduced. It provides only that the cost of reimbursement "may be reduced or denied." Id. The plain language of the IDEA undermines the District's argument that the hearing officer committed a legal error in cutting the reimbursement award in half. I see no independent, compelling reason why the hearing officer's determination should be overturned. It is not this Court's task to dictate educational policy and the hearing officer's award was within the realm of acceptable approaches to the equities of this particular case.

## Conclusion

For the reasons stated above, I **RECOMMEND** that the Court **AFFIRM** the hearing officer's determination that the District failed to provide KS with a FAPE during the fifth and sixth grade as well as her determinations that the Come Spring School was a proper private placement that the District should provide partial tuition reimbursement for.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the

district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 27, 2007